AO 93 (Rev. 12/09) Search and Seizure Warrant   (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT

### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>43359 Carol Drive, Lancaster, California 93535 | )<br>)<br>) Case No.<br>)<br>)<br>) |

**16-0074M**

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Central _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

   See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

   See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property. Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before ___ 14 days from the date of its issuance ___
                                                                        *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.      ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.
                                         *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*  ☐ for _____ days *(not to exceed 30)*.
                                         ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:  1/14/16  11:45 a.m.      *Patrick J. Walsh*
                                                                        *Judge's signature*

City and state:   Los Angeles, California _____      Hon. Patrick J. Walsh, Chief U.S. Magistrate Judge
                                                                        *Printed name and title*

AUSA: J. Wang (x2450)

*AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| | | |
|---|---|---|
| **Return** | | |
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |

Inventory of the property taken and name of any person(s) seized:

[Please provide a description that would be sufficient to demonstrate that the items seized fall within the items authorized to be seized pursuant to the warrant (e.g., type of documents, as opposed to "miscellaneous documents") as well as the approximate volume of any documents seized (e.g., number of boxes).  If reference is made to an attached description of property, specify the number of pages to the attachment and any case number appearing thereon.]

**Certification**  (by officer present during the execution of the warrant)

I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and was returned along with the original warrant to the designated judge through a filing with the Clerk's Office.

Date: _____

_____
Executing officer's signature

_____
Printed name and title

## ATTACHMENT A

PREMISES TO BE SEARCHED

The premises to be searched is located at 43359 Carol Drive, Lancaster, California 93535, and is a single-story residential home with an attached two-car garage. The outside is tan with brown trim on the corners and around the garage door. The garage door is white in color, and the house has a red tile roof. There is a black wrought-iron gate leading to the backyard on the north side of the house, and a brown wood fence on the south side of the house. The numbers "43359" are attached to the flashing of the roof on the south side of the garage.

Instrumentality Protocol

## ATTACHMENT B

### I.  ITEMS TO BE SEIZED

1.  The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of criminal copyright infringement, in violation of Title 17, United States Code, Sections 506(a)(1)(B) and (C), and Title 18, United States Code, Sections 2319(a), (c) and (d), namely:

a.  Unauthorized copyrighted material, including the following copyrighted motion pictures: *The Revenant* and *The Peanuts Movie*.

b.  Records, documents, programs, applications or materials relating to the acquisition and/or possession of unauthorized copyrighted material, including the following copyrighted motion pictures: *The Revenant* and *The Peanuts Movie*.

c.  Records, documents, programs, applications or materials related to the unauthorized distribution of copyrighted material, including the following copyrighted motion pictures: *The Revenant* and *The Peanuts Movie*.

d.  Records, documents, programs, applications or materials reflecting the use of any site used to facilitate the unauthorized distribution of copyrighted material, including the BitTorrent site "tls.passthepopcorn.me."

e.  Records, documents, programs, applications or materials reflecting the true identity of the person(s) using the screen name "clutchit."

f.  Records, documents, programs, applications or materials relating to employment at The Dr. Phil Show.

g.  Indicia of occupancy of 43359 Carol Drive, Lancaster, California 93535 (the "SUBJECT PREMISES"), including records, documents, programs, applications, or

materials, invoices, letters, bills, personal effects, and mortgage, loan, or rental agreements tending to show ownership, occupancy or control of the SUBJECT PREMISES.

       h.     Any digital device used to facilitate the above-listed violations and forensic copies thereof.

       i.     With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

       i.     evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

       ii.     evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

       iii.     evidence of the attachment of other devices;

       iv.     evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

       v.     evidence of the times the device was used;

       vi.     passwords, encryption keys, and other access devices that may be necessary to access the device;

Instrumentality Protocol

       vii.    applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

       viii.    records of or information about Internet Protocol addresses used by the device;

       ix.    records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

**Instrumentality Protocol**

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.      In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.      Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 60 days from the date of execution of the warrant. If additional time is needed, the government may seek an extension of this time period from the Court on or before the date by which the search was to have been completed.

b.      The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.      The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.      The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

c.      When searching a digital device pursuant to the specific search protocols selected, the search team shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

iv                          **Instrumentality Protocol**

    d.  If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

    e.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

    f.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

    g.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access them (after the time for searching the device has expired) absent further court order.

    h.  The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending). Otherwise, the government must return the device.

          **Instrumentality Protocol**

i.      Notwithstanding the above, after the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.      In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.      Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b.      Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.      Any magnetic, electronic, or optical storage device capable of storing digital data;

d.      Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.      Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.      Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.      Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.      The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**Instrumentality Protocol**

## AFFIDAVIT

I, Matthew Harris, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.      I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"),
and have been so employed since June 2014.  I am currently assigned to the Los Angeles Field
Division Intellectual Property Rights crimes ("IPR") Squad, which is responsible for
investigating IPR crimes, including trademark and copyright infringement.  During my career as
an FBI SA, I have participated in numerous IPR investigations.  Since my assignment to the IPR
Squad in October 2014, I have received both formal and informal training from the FBI
regarding trademark and copyright infringement-related investigations.  I have also been working
with and relying on the personal training and experience of more senior Special Agents in my
squad over the course of this investigation.

### II.   PURPOSE OF AFFIDAVIT

2.      This affidavit is made in support of an application for a warrant to search the
premises located at 43359 Carol Drive, Lancaster, California 93535 (the "SUBJECT
PREMISES"), which I have probable cause to believe contains fruits, instrumentalities or
evidence of violations of criminal copyright infringement, in violation of Title 17, United States
Code, Sections 506(a)(1)(B) and (C), and Title 18, United States Code, Sections 2319(a), (c) and
(d).

3.      The facts set forth in this affidavit are based upon my personal observations, my
training and experience, and information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for
the requested warrant and does not purport to set forth all of my knowledge of or investigation

**Instrumentality Protocol**

into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.   PREMISES TO BE SEARCHED

4.       The premises to be searched is located at 43359 Carol Drive, Lancaster, California 93535, and is a single-story residential home with an attached two-car garage. The outside is tan with brown trim on the corners and around the garage door. The garage door is white in color, and the house has a red tile roof. There is a black wrought-iron gate leading to the backyard on the north side of the house, and a brown wood fence on the south side of the house. The numbers "43359" are attached to the flashing of the roof on the south side of the garage.

### IV.   RELEVANT LEGAL STATUTES

5.       Title 17, United States Code, Sections 506(a)(1)(B) and (C) state, in pertinent part, that

> Any person who willfully infringes a copyright shall be punished as provided under section 2319 of title 18, if the infringement was committed –
>
> *      *      *
>
> (B)      by the reproduction or distribution, including any electronic means, during any 180-day period, of 1 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of more than $1,000; or
>
> (C)      by the distribution of a work being prepared for commercial distribution, by making it available on a computer network accessible to members of the public, if such person knew or should have known that the work was intended for commercial distribution.

6.       Title 18, United States Code, Sections 2319(a), (c) and (d) state, in pertinent part, that

> (a)      Any person who violates Section 506(a) (relating to criminal offenses) of Title 17 shall be punished as provided in subsections (b), (c), and (d) and such penalties shall be in addition to any other provisions of title 17 or any other law.
>
> *      *      *

2

**Instrumentality Protocol**

(c)    Any person who commits an offense under section 506(a)(1)(B) of title 17 –

    (1)    shall be imprisoned not more than 3 years, or fined in the amount set forth in this title, or both, if the offense consists of the reproduction or distribution of 10 or more copies or phonorecords or 1 or more copyrighted works, which have a total retail value of $2,500 or more;

\*      \*      \*

(d)    Any person who commits an offense under section 506(a)(1)(C) of title 17 –

    (1)    shall be imprisoned not more than 3 years, fined under this title, or both . . . .

## V.   BACKGROUND REGARDING TERMS USED HEREIN

7.    Internet Service Provider:  Many individuals and businesses obtain access to the Internet through businesses known as Internet Service Providers ("ISPs").  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISP's servers; remotely store electronic files on their customers' behalf; and may provide other services unique to each particular ISP.  ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them.  Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

8.    Internet Protocol ("IP") Address:  An Internet Protocol address (or simply "IP" address) is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be properly directed from its source to its destination.  Most ISPs control a range of IP addresses.

**Instrumentality Protocol**

9.    Screener: A screener, also known as a work print, generally refers to a Digital Video Disc ("DVD") containing a full length motion picture that is specifically prepared for and sent to movie critics and censors for reviewing purposes before that content is available to the public. When diverted before or during a motion picture's theatrical release, a screener DVD provides a significantly higher quality of pirated motion picture content compared to content that is obtained through the use of a camcorder in a movie theater. This level of quality is normally not available until the official release date of the motion picture's DVD, which normally occurs between 60 days and six months after theatrical release.

10.   Watermark: A pattern of bits or graphical additions embedded into a file that are used to identify the source of illegal copies. For example, if a digital watermark is placed into a master copy of movie, then all copies of that film are uniquely identified. If a screener were to distribute a movie outside of their authorized purview, the watermark provides a trace.

11.   BitTorrent: BitTorrent is a peer-to-peer file sharing protocol designed to reduce the bandwidth required to transfer files. It does this by distributing file transfers across multiple systems, thereby lessening the average bandwidth used by each computer. In order to use the BitTorrent protocol, you need a BitTorrent client, which is a software program that accesses the BitTorrent Network.

## VI.   DESCRIPTION OF MOTION PICTURE PIRACY

12.   The Motion Picture Association of America ("MPAA") and its international counterpart, the Motion Picture Association (MPA), are trade associations involved in the motion picture industry and often act as agents for various motion picture studios. They estimate that the motion picture industry loses in excess of $3 billion annually in potential worldwide revenue due to illegal copying, or "piracy," of motion pictures. MPAA investigators routinely encounter the illegal distribution of copyrighted motion pictures on the Internet.

**Instrumentality Protocol**

13.     According to the MPAA, online motion picture piracy is the unauthorized distribution of copyrighted motion pictures on the Internet.  Internet pirates obtain copies of the movies, often before they are released to the public, digitize the motion pictures, and then distribute the movies on the Internet.  In recent years, the ability of household Internet connections to operate at greater speeds and data capacity has led to a significant increase in the uploading of copyrighted material, including motion pictures, and their rapid distribution on the Internet.

## VII. STATEMENT OF PROBABLE CAUSE

### A.     Summary of Investigation

14.     Since December 2015, FBI SAs have been investigating the illegal distribution of the following copyrighted materials: *The Revenant* and *The Peanuts Movie*, both 20th Century Fox ("Fox") movies.  A digital copy of *The Revenant* and a digital copy of *The Peanuts Movie* were uploaded to BitTorrent site "tls.passthepopcorn.me" (the "Pass the Popcorn Site") for redistribution to others.  Each movie contained the following notice across the screen while viewed: "Property of Fox.  May not be copied, uploaded, transferred or sold."

15.     Each movie was uploaded to the Pass the Popcorn Site by the person with the user name "clutchit."  As described below, it has been determined that the username "clutchit" belongs to William Kyle Morarity ("Morarity").   IP Address verification showed that *The Revenant* was uploaded from Morarity's residence, the SUBJECT PREMISES.  The physical copy of *The Revenant* uploaded to the Pass the Popcorn Site has not yet been recovered.

### B.     Deluxe's Investigation

16.     On December 21, 2015, the Vice President of Security Investigations at Fox Group contacted the FBI and explained the following information, which I learned from speaking to him:

      a.      Fox movies *The Revenant* and *The Peanuts Movie* had been uploaded to a movie-sharing BitTorrent website identified as the Pass the Popcorn Site, and were made available for unauthorized distribution over the Internet. Each of these movies were of high quality, and are believed to have been screeners provided to members of the Screen Actors Guild (SAG) based on watermark analysis done by Deluxe, a theatrical distribution company that manages the process of coding (embedding watermarks within screeners), distributing, and tracking screeners for Fox.

      b.      The films *The Revenant* and *The Peanuts Movie* were uploaded to the Pass the Popcorn Site by someone with the user name "clutchit."

      c.      The official release date for *The Revenant* was January 8, 2016, 21 days after the upload, and the official release date for *The Peanuts Movie* was November 6, 2015. Neither movie had been sold or distributed publicly in the DVD or video streaming formats at the time of their uploads to the Pass the Popcorn Site.

17.      Deluxe conducted its own investigation into the uploades and provided "Webwatch" reports for *The Revenant* and *The Peanuts Movie*. A Webwatch report is a forensic analysis report prepared by Deluxe for production studios that they represent which contains information relating to unauthorized uploads of copyrighted materials. Deluxe also provided screenshots of postings and data collected on the Pass the Popcorn Site. On December 22, 2015, I reviewed the Webwatch reports for *The Revenant* and *The Peanuts Movie* and all of the screenshots provided by Deluxe, and learned the following:

      a.      The respective copies of *The Revenant* and *The Peanuts Movie* uploaded to the Pass the Popcorn Site were screeners sent by Fox to Angela Shin on December 15, 2015,

      **Instrumentality Protocol**

at 5555 Melrose Avenue, Mae West Building / Dr. Phil, Los Angeles, California 90038, via

United Parcel Service, based on watermark analysis conducted by Deluxe.

      b.      The Webwatch report for *The Peanuts Movie* contained screenshots from

the Pass the Popcorn Site, which identified a user with the screen name "clutchit" as the

individual who uploaded *The Peanuts Movie* on December 17, 2015, at 10:55:52 a.m. PST.

      c.      The Webwatch report for *The Revenant* contained screenshots from the

Pass the Popcorn Site, which identified that the same user with the screen name "clutchit"

uploaded *The Revenant* on December 19, 2015, at 9:16:51 a.m. PST.  The Webwatch report

contained a screenshot from the Pass the Popcorn Site which identified the IP address used to

upload *The Revenant* as 172.112.160.147 (the "Clutchit IP Address").  An IP address for the

upload of *The Peanuts Movie* was not obtained by Deluxe.

      d.      Screenshots that Deluxe took from the post history of "clutchit" on the

Pass the Popcorn Site contained a photo of the user "clutchit," as well as a post stating he was

"from Los Angeles, California by way of Memphis, Tennessee."

### C.     IP Address Linked to Morarity

18.     Centralops.net, an online tool that can be used to investigate IP addresses,

identified the Clutchit IP Address as being owned by Time Warner Cable ("TWC").  I

subpoenaed and reviewed TWC subscriber information for the Clutchit IP Address and learned

that it is a static IP address which does not change, and was being leased by subscriber William

Morarity at the SUBJECT PREMISES.  TWC confirmed that Morarity began leasing the

Clutchit IP Address on July 16, 2015, and was still leasing the address as of December 23, 2015.

19.     On or about December 21, 2015, I conducted an open source Facebook search and

identified the Facebook page of Morarity, which I confirmed based on the following:

a.      I compared pictures on his Facebook page to the screenshot of the user

"clutchit" taken by Deluxe and determined that they appear to be the same person.

b.      Morarity's Facebook page states that he works as an "Online Post

Coordinator at Dr. Phil." I know from open source queries that The Dr. Phil Show is a daytime

television show headquartered in Los Angeles and located at Paramount Studios, the same

location the screeners of *The Revenant* and *The Peanuts Movie* were delivered to on December

15, 2015.

c.      Morarity also stated on his Facebook page that he is from Memphis,

Tennessee, which is what "clutchit" stated on the Pass the Popcorn Site.

### D.      Morarity Lives at the SUBJECT PREMISES

20.      On January 12, 2016, while conducting surveillance at the SUBJECT

PREMISES, I observed an individual believed to be Morarity (based on pictures from Facebook,

the Pass the Popcorn Site, and California Department of Motor Vehicles ("DMV") records) exit

the SUBJECT PREMISES and get into a blue Toyota Yaris parked in the driveway of the

SUBJECT PREMISES. I followed the Yaris from the SUBJECT PREMISES to a parking

structure across the street from Paramount Studios, and observed the individual walk across the

street and enter Paramount Studios, where The Dr. Phil Show is located and where *The Revenant*

and *The Peanuts Movie* screeners were sent to.

21.      On January 13, 2016, I conducted a query of California DMV records for the

license plate number I observed on the Toyota Yaris and learned that it is registered to William

K. Morarity and Kevin P. Shaw ("Shaw") at an address on Woodcock Avenue in Sylmar,

California, which is where a California DMV records check indicates Shaw resides. I do not

know what Shaw's relationship to Morarity is.

22.     California DMV, TWC, and Accurint records all indicate that Morarity has a registered address of the SUBJECT PREMISES.

## VIII.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

23.     As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.     Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

**Instrumentality Protocol**

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.      Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after

**Instrumentality Protocol**

a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

          e.      Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal

          **Instrumentality Protocol**

information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

    f.  Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

  24.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. ITEMS TO BE SEIZED

  25.  Based on the foregoing, I respectfully submit that there is probable cause to believe that the items listed in Attachment B, which constitute fruits, instrumentalities or evidence of criminal copyright infringement, in violation of Title 17, United States Code, Sections 506(a)(1)(B) and (C), and Title 18, United States Code, Sections 2319(a), (c) and (d), will be found at the SUBJECT PREMISES.

12

Instrumentality Protocol

## X.   CONCLUSION

26.     For all the reasons described above, there is probable cause to believe that fruits,

instrumentalities or evidence of criminal copyright infringement, in violation of Title 17, United

States Code, Sections 506(a)(1)(B) and (C), and Title 18, United States Code, Sections 2319(a),

(c) and (d), as described above and in Attachment B of this affidavit, will be found in a search of

the SUBJECT PREMISES, as further described above and in Attachment A of this affidavit.

Matthew Harris, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this 14th day of January, 2016.

HONORABLE PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE

**Instrumentality Protocol**